# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| **SHARIKA M. ROBINSON,**<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>**ROBINSON BRADSHAW & HINSON, P.A., ALLEN K. ROBERTSON, JONATHAN C. KRISKO, ROBERT E. HARRINGTON, and GREGORY L. SKIDMORE,**<br><br>        **Defendants.** | **Case No.  3:19-cv-00109**<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF TO REDRESS CONTINUING VIOLATIONS OF CIVIL RIGHTS AND FRAUDULENT AND DECEPTIVE PRACTICES

Plaintiff Sharika M. Robinson ("Sharika"),[1] by attorneys Carmen D. Caruso, Linda C. Chatman[2] and T. Greg Doucette, complains against Defendants Robinson, Bradshaw & Hinson, P.A. ("Robinson Bradshaw" or the "Firm") and four of its partners: Allen Robertson ("Robertson"), Jonathan Krisko ("Krisko"), Robert Harrington ("Harrington"), and Gregory Skidmore ("Skidmore") for the deprivation of her civil rights in violation of the Civil Rights Act of 1870 (42 U.S.C. §1981), and under state law, including the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75–1.1 *et seq*.).

---

[1] Plaintiff is identified by her first name, not her last name,  to avoid confusion with Robinson Bradshaw.
[2] Attorneys Caruso and Chatman seek admission *pro hac vice.*

1

**<u>Preliminary Allegations</u>**

1.      Sharika, a Black female lawyer, joined the Robinson Bradshaw law firm in 2015 as an associate attorney after she successfully completed two highly coveted judicial clerkships in the United States District Court for the Eastern District of Michigan and the United States Court of Appeals for the Sixth Circuit.

2.      Sharika accepted employment by Robinson Bradshaw in 2015 because the Firm convinced her through its public advertising and in private interviews it was committed to the ideals of diversity and inclusion.

3.      In substantial part Sharika was impressed that, in 2002, Robinson Bradshaw was an "original signatory" to the Mecklenburg County Bar Association's "Call to Action" on diversity and inclusion in the legal profession. The Firm cited this fact on its web page and, just as the Firm intended, Sharika saw Robinson Bradshaw as a *trailblazer* among law firms on diversity and inclusion.

4.      What Sharika did not know before joining Robinson Bradshaw is that the Firm's claimed commitment in answering the Mecklenburg County Bar Association's 2002 "Call to Action" and its claimed commitment to diversity and inclusion were blatant lies. Robinson Bradshaw has only been faking the existence of a meaningful program to achieve diversity and inclusion in order to attract clients requiring such programs.

5.      In truth, Robinson Bradshaw secretly remains an "good ol' boys club" dominated by White male partners. The Firm uses minorities and women lawyers as "diversity props" to impress clients while overtly, systematically, implicitly, and

2

intentionally discriminating against and oppressing them. On information and belief, the Firm has had no more than ten (10) Black lawyers in its history since 1960.

6. In December 2016, Sharika received an early signal she had unknowingly been recruited to a contemporary version of an old-fashioned Southern plantation. Harrington, a Black male lawyer and Firm partner, invited Sharika to a Firm-sponsored, segregated Christmas Party for Black lawyers only. There was a caveat: Sharika was told the Firm <u>expressly</u> forbade its Black lawyers from discussing any issues related to race as they gathered in Firm-sponsored segregation to "enjoy" the holiday season.

7. This lawsuit comes after the Firm ignored Sharika's vocal grievances for over two years, and after the Firm had ample notice her grievances are valid. In a memorandum dated July 9, 2018 circulated among Firm leadership, belatedly following a firm retreat in September 2017, Robinson Bradshaw admitted:

   a. Lawyers throughout the Firm -- including "[w]omen associates, male associates, women partners, younger male corporate partners, lawyers of color, senior male litigation partners, younger male litigation partners and senior male corporate partners" -- all admitted seeing "**truth**" in the serious problems of discrimination and bias discussed at the retreat; and

   b. "Women associates, women partners and lawyers of color **all** reported **personally identifying** with" examples of bias and discrimination discussed at the Retreat.

(emphasis added).

8. On November 30, 2018, in the United States Equal Employment Opportunity Commission (the "EEOC"), Sharika charged Robinson Bradshaw with continuing race and gender discrimination and retaliation. In further retaliation,

3

Robinson Bradshaw cut Sharika off from meaningful legal work, leaving her alone and isolated.

9.    Seventeen (17) years have now passed since 2002 when Robinson Bradshaw claims to have answered the Mecklenburg County Bar Association's "Call to Action" on diversity and inclusion.  In bitter irony, the United States Supreme Court stated in a 1971 decision that arose here in Charlotte-Mecklenburg that:

> Nearly 17 years ago this Court held, in explicit terms, that state-imposed segregation by race in public schools denies equal protection of the laws.  At no time has the Court deviated in the slightest degree from that holding or its constitutional underpinnings. None of the parties before us challenges the Court's decision of May 17, 1954, that 'in the field of public education the doctrine of 'separate but equal' has no place."

Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 11–12, 91 S. Ct. 1267, 1274, 28 L. Ed. 2d 554 (U.S. 1971)

10.    Seventeen (17) years was long enough for Robinson Bradshaw to develop and implement a meaningful commitment to diversity and inclusion as it has publicly claimed to have done.

11.    Seventeen years is too long to wait for justice.

12.    The discriminatory, hostile, and retaliatory conduct of Robinson Bradshaw and its partners shocks the conscience and offends every notion of justice the legal profession claims to stand for.

13.    In falsely promoting its claimed commitment to diversity and inclusion, Robinson Bradshaw and its partners have engaged in continuing deception against: (i) Sharika and other women and persons of color seeking employment at the Firm;

4

(ii) actual and prospective clients that demand diversity in the law firms they hire; and (iii) courts and tribunals where the Firm practices, and the legal profession generally, as the Firm seeks to bask in the underserved glow of supposedly being committed to diversity and inclusion.

14.     The conduct of Robinson Bradshaw and its partners has inflicted substantial injury on Sharika including actual and consequential economic damages and non-economic injuries that will be proven at trial.

15.     Robinson Bradshaw and its partners have profited by maintaining their false façade of diversity and inclusion.   These Defendants must now be held accountable to the fullest extent of the law.

## Summary of Claims

16.     Sharika alleges:

Count I:        Disparate treatment in violation of 42 U.S.C. §1981;

Count II:       Hostile work environment in violation of 42 U.S.C. §1981;

Count III:      Unlawful retaliation in violation of 42 U.S.C. §1981;

Count IV:       Statutory fraud in violation of the North Carolina Unfair & Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1, *et seq.*;

Count V:        Common law fraud;

Count VI:       Breach of Contract, including the implied covenant of good faith and fair dealing;

Count VII:      Tortious interference with employment by the individual defendants; and

Count VIII:  Claim for punitive damages.

5

17. Sharika anticipates bringing additional claims if granted the right to sue by the Equal Employment Opportunity Commission.

18. Sharika seeks all remedies available and, to the extent permissible, she defers any election of remedies against the Defendants she may have to make before the entry of final judgment. The relief being sought includes but is not limited to:

   a. Actual and consequential damages in amounts to be determined at trial to redress substantial economic injuries, including damages to her career and professional reputation and lost future earnings.

   b. Actual and consequential damages in amounts to be determined at trial to redress substantial non-economic injuries, including emotional distress, mental, and physical suffering.

   c. An accounting by the Firm of all revenues and profits obtained by its continuing fraudulent and deceptive practices and the disgorgement of those revenues or profits.

   d. Punitive damages to punish these wrongdoers and deter other lawyers and law firms from like deprivations of civil rights and fraudulent and tortious conduct.

   e. Injunctive or other equitable relief against further discriminatory, hostile, retaliatory, fraudulent and deceptive conduct.

   f. Additional remedies under N.C. Gen. Stat. §§ 75-1, *et seq*., including treble damages.

   g. The recovery of costs and attorneys' fees.

h. Such further relief the Court deems just and proper.

**Parties**

19.     Plaintiff Sharika M. Robinson is a Black woman born and raised in North Carolina now residing in Huntersville, North Carolina.  Her path to the law was fraught with obstacles and took great intellect, courage, and perseverance. Sharika was a teen mother with the cards stacked against her from the beginning. She has not only successfully raised her children, she also worked her way through college and law school, achieving the honor of valedictorian of her law school class. After graduation, Sharika was twice granted the honor of federal clerkships by the Honorable Victoria A. Roberts in the Eastern District of Michigan and the Honorable Damon J. Keith in the United States Court of Appeals for the Sixth Circuit.  Both Judge Roberts and Judge Keith hold her in high esteem and provided glowing endorsements.  She is currently licensed to practice law in North Carolina and is eminently qualified to practice law with Robinson Bradshaw.

20.     Defendant Robinson Bradshaw is a law firm organized under North Carolina law with its principal office at 101 North Tryon Street, Charlotte, North Carolina 28202.

21.     Robinson Bradshaw acts through its partners, who individually and collectively bear responsibility for the acts and omissions alleged.  All acts and omissions by the Firm's partners were done in the Firm's practice of law and are imputed to the Firm under *respondeat superior*.

7

22.     On information and belief, individual Defendants Gregory Skidmore ("Skidmore"), Allen Robertson ("Robertson"), Jonathan Krisko ("Krisko"), and Robert Harrington ("Harrington") are licensed attorneys residing in this District and partners at Robinson Bradshaw that exercised supervisory authority over Sharika to a degree rendering them personally liable:

    a.  Robertson is a white male and is the Firm's managing partner.

    b.  Krisko is a white male and is co-chair of the Firm's litigation practice.

    c.  Harrington is a black male and is co-chair of the Firm's litigation practice.

    d.  Skidmore is a white male litigation partner.

## **Jurisdiction and Venue**

23.     Plaintiff brings federal claims for discrimination and retaliation under the Civil Rights Act of 1870 (42 U.S.C. § 1981).

24.     Plaintiff brings state law claims under both the North Carolina Unfair & Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1 *et seq*.), and North Carolina common law.

25.     Jurisdiction is conferred by 28 U.S.C. §§ 1331, 1343(a)(3) and 42 U.S.C. §1988; and the Court has supplemental jurisdiction over Plaintiff's state law claims.

26.     Venue is proper under 28 U.S.C. § 1391 because this unlawful conduct occurred, and the Defendants reside in, this District.

## FACTS

### Robinson Bradshaw

27.     Formed in 1960, Robinson Bradshaw has about one-hundred and sixty-five (165) lawyers with offices in Charlotte and Chapel Hill, North Carolina, and Rock Hill, South Carolina.  The Firm's practice of law includes the representation of clients from outside North Carolina and participation in cases and other legal matters outside North Carolina, affecting interstate commerce.

28.     Robinson Bradshaw claims, and for many years has claimed, to be a leader among law firms in embracing the ideals of diversity and inclusion of women lawyers and lawyers of color.

29.     For example, the Firm's present web site states:

> At Robinson Bradshaw, we believe we can better solve our clients' problems when our team is made up of diverse individuals. We are dedicated to promoting an inclusive work environment in which people with different backgrounds share a commitment to our core ideals of professionalism, excellence and teamwork. We recognize that both the professional and personal rewards of our shared efforts are enhanced by this spirit of inclusion.[3]

30.     In 2014, when Sharika explored opportunity with Robinson Bradshaw, the Firm's web site emphasized a "commit[ment]" to the "ideals of openness, diversity and inclusiveness" and stated:

> **Diversity**
>
> We seek to establish, maintain and communicate an inclusive work environment in which people of diverse backgrounds, outlooks and interest can share a commitment to our core ideals of professionalism,

---

[3] https://www.robinsonbradshaw.com/firm-diversity.html

9

excellence and teamwork. We recognize that both the professional and personal rewards of our shared efforts are enhanced by the diversity that is fostered by this spirit of inclusion. We believe we work better among ourselves and in solving clients' problems when our team is made up of diverse individuals.[4]

31.    At  https://www.robinsonbradshaw.com/firm-diversity.html  the Firm represents it was "an original signatory to the Mecklenburg County Bar's 2002 Call to Action to increase bar diversity."[5]  On information and belief the Firm has continuously represented this to the public since 2002.

32.    Since 2002, the Mecklenburg County Bar Association's Call to Action on Diversity and Inclusion has required signatory law firms to publicly commit, without limitation, to:

      a.  "recruit, hire, train and retain minority law students and/or attorneys";

      b.  "establish effective mentoring and leadership training programs";

      c.  "promote, foster, and enhance diversity efforts among managing structures";

      d.  "encourage participation in sensitivity and diversity training"; and

      e.  "solicit applications from minority candidates through marketing pieces reflecting their commitment to diversity." [6]

33.    In continuously touting, since 2002, that it was an "original signatory" to the Mecklenburg County Bar Association's Call to Action on diversity and inclusion, Robinson Bradshaw is not merely claiming to have signed a piece of paper.

---

[4] https://web.archive.org/web/20150206084134/http://www.rbh.com:80/diversity
[5] https://www.robinsonbradshaw.com/firm-diversity.html (January 24, 2019)
[6] https://www.meckbar.org/index.cfm?pg=diversity-inclusion

10

It intends for prospective employees, prospective clients, the legal profession, and the public to believe, contrary to fact, that since 2002 or earlier the Firm has been committed to "action" on diversity and inclusion.

34.     As of 2014, when Sharika explored opportunity with Robinson Bradshaw, the Firm represented that:

> Our Inclusion Committee undertakes to focus the Firm's efforts to have an environment that embraces individual differences and promotes the personal inclusion of all lawyers. The Committee's activities encompass:
>
> • Ensuring that our spirit of inclusion is communicated internally and externally
>
> • Welcoming new lawyers and fostering their personal involvement in the Firm
>
> • Supporting the Firm's efforts to recruit, retain and develop lawyers with diverse backgrounds, outlooks and interests
>
> • Evaluating and supporting opportunities to partner with others in the Bar and the community in diversity initiatives[7]

### Sharika joins Robinson Bradshaw

35.     In 2014, Sharika reviewed Robinson Bradshaw's web page, conducted other due diligence about the Firm, then applied for employment with Robinson Bradshaw.

36.     In January 2015, Sharika reviewed a Robinson Bradshaw marketing brochure the Firm gave her during her interviews. This brochure repeated in substance the Firm's lofty claims of commitment to diversity and inclusion Sharika had seen on its web page.  And, the brochure displayed the faces of eight (8) lawyers,

---

[7] https://www.robinsonbradshaw.com/firm-diversity.html (January 24, 2019).

five (5) of whom were diverse based on race or gender. Sharika knew this ratio was not fact; she understood this aspirational ratio as the Firm's way of emphasizing its commitment to diversity and inclusion.

37. In January 2015, Sharika interviewed at the Firm's Charlotte office. She met with about twenty (20) Robinson Bradshaw lawyers, including now-managing partner Allen Robertson, litigation partners Blaine Sanders, Stephen Cox, Amanda Pickens, and Angie Vincent-Hamacher, and litigation practice co-leader Rob Harrington. In these interviews Sharika truthfully communicated her life story, accomplishments, and ambitions to the approximate 20 Firm lawyers she met with; and these approximate 20 Firm lawyers:

    a. Claimed Robinson Bradshaw is *the* most collaborative and collegial law firm in the United States and a place where Sharika could thrive.

    b. Claimed the Firm was committed to diversity and inclusion, and was structured to eliminate favoritism in assigning work to lawyers, which could frustrate diversity and inclusion. They explained that work was distributed systematically, not based on favoritism, and that Sharika would have equal opportunity to work for clients and cases or matters deemed most important.

    c. Claimed the Firm strives to provide associates with meaningful work opportunities commensurate with their experience enabling them to develop skills and experience early in their careers.

    d. Claimed the Firm considers *pro bono* legal work important.

12

e. Claimed the Firm focuses on achieving outcomes and results for clients efficiently.

f. Claimed that to avoid rewarding inefficiency, the Firm had eliminated billable hour requirements. They elaborated that eliminating formal billable hours requirements also encouraged work-life balance, allowing lawyers to pursue community and board involvement and/or meet childcare commitments and spend time with their families.

38. In exact words or substance, each of the approximate twenty (20) Firm lawyers Sharika interviewed with in January 2015, including Robertson, Sanders, Cox, Pickens, Vincent-Hamacher, and Harrington, made or affirmed the statements alleged above. No Firm lawyer said anything contradictory on these points.

39. Sharika reasonably relied on each statement made or affirmed to her by the Firm attorneys in her interviews as alleged above. Nor was she aware of any important facts the Firm did not disclose.

40. In every possible way, the Firm during her pre-employment interviews in or about January 2015 affirmed to Sharika it would enthusiastically embrace her diversity as a Black woman with children, welcome her perspectives, and strongly support her development as a lawyer on challenging cases and assignments.

41. Relying on the Firm's oral and written representations, and having no reason not to believe them, Sharika rejected other opportunities and accepted the Firm's offer of employment in February 2015.

13

42.    On or about August 15, 2015, Sharika began practicing law with Robinson Bradshaw as an associate, having relocated from Michigan to Charlotte, North Carolina to pursue this opportunity with the Firm.

43.    In or about September 2016, Sharika joined the Firm's litigation practice, having spent her first year in the Firm's standard rotation for new lawyers through the Firm's different practices.

### The Firm's Commitment to Diversity and Inclusion is Hollow

44.    After joining Robinson Bradshaw, Sharika learned the Firm's public claim to have been a leader since 2002 on diversity and inclusion are false and misleading.

45.    Cumulatively, Sharika learned since 2015 that:

a.    White males predominate as partners in every practice group, control all or most client relationships, and control the opportunities available to associate attorneys to gain experience, enhance their skills, and advance toward partnership.

b.    The predominant white males consistently overlook minorities and women, and consistently prefer whites and males over persons like Sharika in extending these opportunities.

c.    White female lawyers are far fewer but constitute the second largest demographic group, and the Firm routinely discriminates against pregnant women and new mothers.

14

d. Lawyers of color are few. One recently hired Black male associate and Sharika are the only Black associates in the Firm's three offices, among no more than 10 Black lawyers at the Firm since 1960.

e. Black lawyers and women lawyers receive less favorable opportunities to develop professionally. Typically they are staffed on cases and matters when clients demand diversity, then are assigned busywork with no meaningful impact. White and male lawyers are favored at every step and not subjected to this humiliation.

f. The Firm uses Black and women lawyers as "diversity props." For example, the Firm displays the photo of its one Black male associate as the "face" of "Happy Associates" on the Firm's web page.

g. On information and belief, the Firm has used Sharika's name, photo, or likeness in marketing materials intending to highlight a claimed commitment to diversity.

h. The Firm intends for clients and prospective clients to believe, contrary to fact, that minority and women lawyers at Robinson Bradshaw play equal or comparable roles on cases and other matters.

46. In the Fall of 2016, the Firm appointed Sharika to the Firm's Diversity and Inclusion Committee. This committee meets no more than once per year.

47. In 2016, 2017, and 2018, Sharika attended the diversity and inclusion committee meetings. Nothing of substance was accomplished at any of them.

15

48.    In 2016 and 2017, the Firm made no progress increasing women or minorities but instead seemed to go backwards.  Minority lawyers were leaving, not staying.

## Disparate Treatment

49.    From her first days at Robinson Bradshaw to the present, Sharika experienced disparate treatment in numerous ways including, without limitation:

a. Contrary to the Firm's represented commitment to be even-handed and systematic in assigning legal work to its lawyers, the Firm assigned work to Sharika unevenly.  When Sharika said this was not what she had been led to expect, she was told to go to the partners and "smile" and ask for work.

b. More often than not, Sharika would be assigned work on smaller cases, or receive only small assignments on larger cases. She was marginalized, not challenged.

c. The Firm's assignments to Sharika were usually less challenging than what she had accomplished as a judicial law clerk.

d. Sharika repeatedly asked Firm partners, including Cox and Krisko, for more substantive work but her requests were never honored.

e. On numerous occasions, a Firm partner brought Sharika into a client meeting where she had no role other than to be in the room and be seen by the client.

16

f.  On other cases, Sharika was not introduced to clients and had no substantive client contact.

g.  On the rare occasions where she was given meaningful client contact, Sharika developed client relationships and has obtained new business for the Firm.

h.  On numerous occasions, Sharika was not invited to conferences in which Firm lawyers discussed cases she was working on.

i.  Sharika was typically excluded from participating in discussion among Firm attorneys on case strategy, direction, and decision-making.

j.  Sharika was frequently treated as an "associate to other associates" and assigned grunt work.

k.  The Firm never once allowed Sharika to present or argue a motion in state or federal court, even though Sharika came to the Firm with judicial clerking experience that included being in court for trials and motions.

l.  The Firm never once allowed Sharika to attend depositions to watch and learn, or to take or defend depositions herself, even though Sharika came to the Firm with judicial clerking experience that included reviewing transcripts of depositions or trial testimony and learning what good witness examinations looked like.

17

m. The Firm denied Sharika's requests for continuing legal education training in taking depositions and developing trial skills.

50.     In summary, Robinson Bradshaw has not nurtured or supported Sharika in her professional growth and development.  It has cruelly stunted her professional growth and development.

51.     White associates in the Firm's litigation practice have greater access to white partners, and typically receive more favorable treatment in assignments, playing larger roles, being in the room for meetings, decision-making, and strategy, and having client access, and they have been permitted to argue motions and attend, take, and defend depositions. White associates are supported in their professional growth in countless ways Sharika was not.

52.     Nor does Robinson Bradshaw include Sharika in social and marketing events reserved for white male lawyers, such as playing golf or attending meals and sporting events.   White male associates are favored in socialization and marketing.

### Hostile work environment

53.     In multiple ways the Firm has been a hostile work environment since 2015 including, without limitation:

a. The Firm does not welcome diverse points of view.

b. The Firm discourages women or persons of color from raising issues important to them.  For example, the Firm suppressed Sharika's attempt at a Firm retreat in or about September 2016 to discuss the shooting of a Black male by the Charlotte police department even

18

though this incident was widely reported in the media and led to protestors demonstrating on the streets near the Firm's offices. Despite being literally impossible to ignore, the incident was not open for discussion at the Firm's retreat.

c. The Firm does not commend Sharika's work when commendation is earned and warranted.

d. Women and persons of color may not express themselves but must be on guard against making the white male lawyers uncomfortable.

e. The Firm was hostile to Sharika's *pro bono* representation of a Black woman business owner.

f. In 2015 or 2016, at a Firm event including spouses, a white partner approached Sharika's then-husband, reached out, and touched his hair. Sharika observed no similar touching of white people's hair. She reasonably found this incident to be offensive.

g. The Firm consistently allowed partners and associates to treat Sharika without respect and sometimes with open hostility.

h. Black lawyers are relegated to a segregated Christmas party at which the Firm expressly restricts their right to speak freely.

i. Every single day, the atmosphere was one of isolation and exclusion, not inclusion.

54.    In 2016 and 2017, Sharika attempted to challenge the Firm's hostile environment and sought support from Harrington, a Black male lawyer who was co-

19

chair of her litigation practice, and from others. Harrington and others told Sharika she needed to accept this type of treatment and not to expect the Firm to change.

### The Firm allows Greg Skidmore to harass Sharika

55.     In December 2016, Sharika was assigned to work on a case with Greg Skidmore, a white male lateral partner, who in that role exercised supervisory authority over Sharika.

56.     From the beginning of her case with Skidmore, and overlapping the hostility she experienced on the *pro bono* case alleged above, Skidmore repeatedly and consistently demeaned Sharika, refused to collaborate with her, and provided her no meaningful growth and development opportunities on the case.

57.     As a partner in the Firm, Skidmore sent a clear message to other lawyers he did not respect Sharika, and implicitly that no one else needed to either.

58.     As Christmas 2016 approached, Skidmore told Sharika she was now the "associate-to-another-associate" Mark Hiller, a white male about three years ahead of Sharika at the Firm. Skidmore told Sharika to expect Hiller to give her a research assignment to be completed over the Christmas and New Year holidays.

59.     Sharika tried to suggest legal arguments to make on behalf of the Firm's clients but was ignored.

60.     When Hiller called to give her a research assignment, he told Sharika he did "not need or want her thoughts," just the case citations.

61.     On multiple occasions in 2016 and 2017 in this case, Sharika complained about Skidmore's abusive treatment to her mentor, Cox, and other Firm partners, to

20

no avail. On information and belief, no one at the Firm told Skidmore to stop; if they did, Skidmore did not listen, and no consequence was ever imposed.

62. In March 2017, Sharika learned she was pregnant.

63. After she was visibly pregnant, Skidmore told Sharika she had "no seat at the table" on strategizing their case, and increasingly treated her with disrespect, often causing Sharika to cry at work and interfering with her ability to work.

64. Sharika's vulnerability to emotional distress was aggravated by her pregnancy, a fact known to Skidmore and everyone else.

65. By late 2017, after her doctor advised her that her pregnancy was high risk and she must avoid additional stress, Sharika told the Firm she could no longer work with Skidmore and was taken off the case. She was later induced early due to complications caused by aggravated stress.

66. The Firm and Skidmore were the direct and proximate causes of Sharika's stress while pregnant.

67. Skidmore remains with the Firm and is often a visible representative of the Firm's Diversity & Inclusion Committee.

### The Firm discusses its culture of discrimination

68. To its credit, in September 2017 at its annual retreat, the Firm presented videotaped vignettes depicting incidents of workplace discrimination that Firm attorneys had anonymously reported, showing, for example, how women are diversity props and how conversations change when "little ladies" walk in the room.

21

69.     Sharika spoke plainly at the retreat.  She told the Firm that as a Black woman she had been unfairly mistreated, making it hard for her to come to work and practice law with the Firm.  Visibly pregnant, Sharika explained how hurtful it was to work at Robinson Bradshaw.

70.     Other women lawyers at the Firm cautioned the Firm not to place "the business case for diversity" above the "core values" that diversity and inclusion programs are supposedly intended to achieve.

71.     After the vignettes and discussions, Firm attorneys were segregated into affinity groups (older white men, young white men, minorities, women) to discuss the impact of the vignettes and next steps. Those discussions were memorialized.

72.     The Firm had specific notice no later than its September 2017 retreat that minority and women lawyers viewed the Firm as a "good ol' boys club" causing disparate treatment in assigning work and allowing attorneys to develop.

73.     The facts brought into the open at the September 2017 retreat were open and obvious.  The Firm knew or recklessly disregarded those facts for many years.

74.     The facts brought into the open at the September 2017 retreat contradicted the Firm's representations to the public and to prospective clients on the subjects of diversity and inclusion it makes on its webpage and in its brochures, but the Firm continues to make those representations undeterred.

75.     In a memorandum dated July 9, 2018, the Firm's "Retreat Discussion Committee" summarized what the Firm supposedly learned at the September 2017 retreat.  Without limitation, the Firm's July 9, 2018 memorandum  documented that:

a. "In the absence of a formal system for assigning work and client opportunities, the difference between **falling through the cracks** and **developing fruitful working relationships** can come down to finding common ground and shared personal interests with partners";

b. "lawyers of color observed that, under our present system, no partner has a vested interest in any one associate's professional development"; and

c. "Women associates reported that **it may be difficult to develop relationships with those that don't look like them**."

(Emphasis added).

76.    In its July 9, 2018 memorandum, the Retreat Discussion Committee called for greater action on diversity and inclusion, but little or no action was taken.

77.    The Firm's July 9, 2018 memorandum documented only some of the Firm's deficiencies on the subjects of diversity and inclusion, and was written in polite language understating the extent of this problem at Robinson Bradshaw.

78.    The Firm has never acknowledged how the facts discussed at the September 2017 retreat have affected Sharika.

79.    Nothing about the Firm's treatment of Sharika changed after the September 2017 retreat or the July 9, 2018 memorandum.

**The Firm's promises on flexibility for working moms proved hollow**

80.    Despite its web page and oral representations about work/life balance and being flexible when parents must care for their children, Sharika learned in 2016 and 2017 these promises were false.

81.    There were times in 2016 and 2017 when Sharika worked from home or left early to pick her children up from school, make parent-teacher meetings, or

23

attend doctor's appointments for her children. She was not the only lawyer doing so occasionally.

82. In late summer or fall of 2017 the Firm's General Counsel, Kate Maynard, informed Sharika that work/life balance did not exist at Robinson Bradshaw and she should not work from home, or she would have to accept a reduction in salary. Sharika responded the Firm was contradicting the discussions before she was hired, and was being unfair and discriminatory against women, who generally have greater responsibility for child care, and especially unfair to Black women that are more likely to be single moms.

83. On the question of flexible hours and working remotely, Sharika sought support from the Diversity & Inclusion Committee and the leadership of the litigation practice group. Sharika pointed out the Firm had lawyers in three offices in three cities working together "remotely" every day.

84. Sharika pointed out that a white male associate, Erik Zimmerman, in the Firm's Chapel Hill office worked remotely every day with the Charlotte litigation team. If Zimmerman could be engaged daily from an office 140 miles away from the Charlotte office, why could a woman not be engaged from her home office only 20 miles away from the Charlotte office?

85. Sharika further highlighted that Amit Bhagwandass (a brown man) worked from home daily and had fewer years of experience than Sharika but was still fully-engaged.

24

86. To be clear: Sharika was not seeking to work less, or work remotely as the norm; she was asking for flexibility for when a child is sick or the like. She would come to the office early if she knew she had to leave early and/or she would work remotely from home, even late into the evening, to complete tasks.

### The Firm denies Sharika's request for flex time

87. On or about December 2017, Sharika went out on maternity leave and delivered her child in January 2018.

88. Before going out on leave, Sharika informed the Firm she would work from home immediately when she returned while she integrated her nanny and caregiver into her family. Sharika was informed by the Firm's human resources manager this would be fine.

89. In April 2018, Sharika worked from home immediately after returning as agreed.

90. In March 2018, while still on maternity leave, Sharika asked Harrington, as co-leader of the litigation practice, if she would be able to temporarily adjust her schedule (to work from home on certain days or arrive early and leave the office early) to care for her newborn child after she returned to work. Sharika was clear she was not asking for a reduced case load, only some temporary flexibility.

91. In response, Harrington told Sharika her idea would affect her career, because her role on cases or client matters would be restricted. Sharika advised Harrington his statements were discriminatory.

92.     Sharika then met with Robertson, the managing partner, to discuss her request for flex time.  Robertson told Sharika to be "realistic" about whether it was feasible for her to work full-time.  Sharika advised Robertson this was discriminatory.

93.     On May 7, 2018, Robertson sent Sharika an email stating that "over the years [the Firm] has been able to successfully fashion work schedules for quite a number of … female attorneys[.]"  Robertson indicated that "[t]he starting point … is to understand what … [Sharika] believe[s] is feasible … (taking into account … arrangements with a nanny or other childcare providers and the fact that there are only 24 hours in a day), and "then for [Sharika] and [Robertson] to consider whether and how … much work [Sharika] can take on, the nature of … [Sharika's] work … and … [Sharika's] compensation."  Robertson then posed these questions to Sharika:

a. "will you have the flexibility (e.g., child care arrangements in place) to stay in the office later in the afternoon and early evening";

b. "do you expect to be available after 4 p.m. (e.g., will you have child care arrangements in place or otherwise be able to take care of your children while doing client work)";

c. "will you be available continuously after 4 p.m., or would you expect there be some period of time (4 – 7 p.m.?) when you would be in transit, picking up children, preparing supper, etc., and would not be available";

d. "If you will be able to log back in and work in the late afternoon/evenings, would you expect/be willing to do that regularly";

26

e. "[s]ame questions with respect to the weekends";

f. "Will you have the flexibility (e.g., child care arrangements) to come to the office and work on a weekend";

g. "will you be able to work remotely on a weekend"; and

h. "will you have the flexibility (e.g., child care arrangements) to travel out of town for one or more nights[?]"

94. On information and belief, Sharika's conversations with Harrington and Robertson and her demand for equality had, once again, made her a target.

95. On May 10, 2018, Sharika emailed Robertson and withdrew her request for a flexible schedule.

96. Robertson did not accept Sharika's withdrawal of her request for a flexible schedule. Instead, he told Sharika he still wanted to meet to discuss whether it was feasible for Sharika to practice law full-time while caring for her children.

97. Within days of sending her email on May 10, 2018, Sharika met with Robertson at his request: (i) Robertson asserted that as the mother of a newborn, Sharika could not practice law full-time and urged her to accept reduced work and reduced pay; and (ii) Robertson told Sharika she had failed to "hit the ground running" from maternity leave and failed to meet the Firm's expectations.

98. Sharika advised Robertson that his statements were discriminatory and actions in retaliation to her request for flex time. Sharika also indicated that Zimmerman and Bhagwandass were allowed flex time.

27

99.    Upon information and belief, no man nor any white associate was ordered to accept reduced pay for reduced work after returning to the Firm from maternity or paternity leave.

### Sharika earns a "victory lap" but does not receive one

100.    On or about April 9, 2018, Sharika returned to work and was the only associate staffed on an arbitration matter involving substantial claims scheduled for hearing on May 1 and May 2, 2018.

101.    White male partner Sanders was the Firm partner handling the case and supervising Sharika.

102.    To prepare for the arbitration hearing, Sharika did legal research, reviewed the document productions and deposition transcripts, contributed substantially to developing the client's arguments and its theme for the hearing, and wrote the first draft of the hearing brief.

103.    About two weeks before the hearing, Sharika learned from Sanders the client had hired a well-respected outside partner, Clay Hoblit ("Hoblit") from Hoblit, Darling, Ralls, Hernandez & Hudlow, LLP in Texas to be lead trial counsel at the hearing.

104.    To participate in the hearing, Sharika travelled on May 1 and 2, 2018 to Winston-Salem, staying overnight away from her newborn child.  This is not something most new mothers do, and Sharika did not want to be away from her newborn.  But she was determined to participate in this arbitration hearing.  She had

28

been waiting quite some time at Robinson Bradshaw for a meaningful opportunity to work on a substantial case and demonstrate her talent and potential to the Firm.

105.    The new lead counsel from outside the Firm allowed Sharika to give part of the closing argument, which she did.

106.    The new lead counsel from outside the Firm gave Sharika credit for developing an important argument that contributed substantially to their victory and added that Sharika was a natural trial lawyer.

107.    The Firm's client also praised Sharika's work and credited her for contributing a substantial part of the winning argument.

108.    Sharika returned to Robinson Bradshaw hoping her success in this arbitration hearing would lead to more and better opportunities in the Firm.  It did not.  There was no victory lap for Sharika.

### The Firm decides Sharika must be silenced

109.    Robinson Bradshaw did not merely ignore Sharika's triumphant moment in the May 2018 arbitration hearing.

110.    In May 2018, after she had rejected Robertson's pressure to accept reduced pay for reduced hours, but also after the arbitration hearing where her performance earned substantial praise, Harrington and Krisko, the leaders of the litigation practice, placed Sharika on a performance improvement plan ("PIP").

111.    Under the PIP, the Firm would review Sharika's performance at ninety (90) and one-hundred and eighty (180) days.

29

112. Sharika has done employment law work. She knew that a PIP often reflects an employer's efforts to document grounds for termination.

113. Harrington and Krisko claimed the PIP resulted from Sharika's unsatisfactory performance in her first three weeks after returning from her maternity leave.

114. In response, Sharika told Harrington and Krisko the PIP was discriminatory and retaliatory. She pointed to her success in the arbitration case and the praise she received from lead counsel as refuting the Firm's allegation her performance subjected her to a PIP.

115. The response Sharika received from Harrington shocked her. Harrington, a Black male partner, had attended the Firm's September 2017 retreat and knew from that occasion, and others, the existence of discrimination and bias within Robinson Bradshaw was real. Sharika knew it was impossible that Harrington denied the existence of this serious problem.

116. But Harrington told Sharika he "categorically" rejected Sharika's claim the PIP was unlawful discrimination and retaliation.

117. Harrington then declared Sharika's performance in the arbitration hearing and the praise she received from the client and the lead counsel did not count. Harrington's twisted logic, that he explained to Sharika, was that: (i) Robinson Bradshaw is better than other law firms because it "takes on matters other firms cannot win" and has "the best attorneys on the market;" (ii) at Robinson Bradshaw,

"good is not good enough, great is the good, [and] excellent is great"; and (iii) therefore, praise from a lawyer at another law firm means nothing.

## Sharika overcomes the PIP

118.    In August 2018, at her 90-day review under the PIP, the Firm rated Sharika "great to excellent" in recent performance and told her she was back on track.

## Sharika again complains of race discrimination

119.    On October 16, 2018, David Schilli ("Schilli"), a partner in the Firm's bankruptcy practice, reviewed a draft article Sharika wrote intended for Bar Association publication, then told Sharika her writing did not conform to "fairly widely accepted … principles of legal writing."

120.    Sharika's draft article was on a bankruptcy law topic, which is why she ran the draft past Schilli for his comments.

121.    Sharika had hoped Schilli could offer substantive insights based on his experience in this area of law and was prepared to welcome all of his constructive comments.  Sharika was trying hard to build relationships among the Firm partners.

122.    Sharika never claimed to be perfect, but based on her record in law school, as a federal judicial clerk, and at the Firm (when permitted to contribute) she was confident her legal writing conformed to most if not all "widely accepted" "principles of legal writing."

123.    Sharika reasonably saw Schilli's criticism as just the latest example of implicit bias permeating the Firm making it impossible for a Black female lawyer to be treated and evaluated fairly.

31

124.     Sharika responded to Schilli, politely but firmly calling out this racial discrimination, and she shared her complaint to Firm leaders, including Harrington, Krisko, Robertson and Vincent-Hamacher.

125.     The North Carolina Bar Association soon published Sharika's article as drafted by Sharika.

### Further Retaliation

126.     After she complained to the Firm about Schilli, Sharika received no new assignments and had no work to perform for days.

127.     On November 27, 2018, Sharika emailed Krisko asking for work. None came.

128.     On November 30, 2018, Robertson and Krisko advised Sharika her performance evaluation was extended an additional ninety (90) days because she allegedly mishandled the situation with Schilli and cited other pretextual deficiencies.

129.     In response on November 30, 2018, Sharika told Robertson and Krisko she had been subjected to discrimination and hostile environment based on race and gender and that things had gotten a lot worse since she returned from maternity leave and raised gender disparity.

130.     Firm managing partner Robertson told Sharika she needed to "cope with the Firm's culture better."

32

## Sharika charges Robinson Bradshaw in the EEOC

131. On November 30, 2018, Sharika filed a *pro se* charge of discrimination with the EEOC, complaining of discrimination and retaliation based on race, gender, pregnancy, and disability.

## Retaliation constituting constructive discharge

132. Following its receipt of Sharika's EEOC complaint, the Firm has treated Sharika as though she has been quarantined. She is isolated and alone. She has endured cold stares and angry outbursts. This treatment continues.

133. Following its receipt of Sharika's EEOC complaint, the Firm, through Krisko and other partners, has also attempted to disrupt relationships Sharika formed with certain clients and client contacts. Krisko has attempted to portray Sharika to clients as unresponsive and as demoted to a subordinated status.

134. Since November 2018, and escalating after its receipt of her EEOC charge, the Firm has deliberately made Sharika's working conditions intolerable to induce her to quit:

   a. Sharika receives no meaningful work opportunity and virtually no work; and

   b. Sharika's growth as a lawyer and progress in her career have been arrested.

135. The conditions the Firm has imposed on Sharika are harsh and would be intolerable to any reasonable person in her position.

136. To avoid greater damages, Sharika has not resigned.

33

137.    After November 30, 2018, Sharika remained ready, willing, and able to work hard and earn her compensation from the Firm.

## Injuries to Sharika

138.    As the foreseeable, direct and proximate result of the Firm's conduct, acts and omissions, and those of Skidmore, Robertson, Krisko and Harrington in their supervisory roles, Sharika has and will continue to suffer actual and consequential economic damages and non-economic damages in amounts not presently known.

    a.  Sharika's career trajectory and progress and opportunity to earn future income has been substantially damaged.  The Firm's conduct in bringing Sharika's career to a halt, constituting constructive discharge, has aggravated Sharika's economic injuries.

    b.  Sharika has and will continue to suffer humiliation and severe emotional distress and related physical suffering.  The Defendants have sought to destroy Sharika's confidence in herself as a lawyer and a person.  They have caused her to question whether the legal profession, sworn to uphold justice, is committed to justice, and whether "diversity" and "inclusion" mean *anything* in the legal profession other than another cynical marketing program.  In these ways, and in escalating their campaign against Sharika while she was pregnant and then after her child was born, these Defendants were especially cruel.

34

139. The conduct of the Firm and Skidmore, Robertson, Krisko and Harrington has been intentional, as they have sought to drive Sharika from their White male law firm once they realized she refused to surrender her diverse identity as a proud Black single mom as the price of admission to their law firm, and refused to accept her apparently-assigned role as a second-class lawyer.

140. The conduct of the Firm and the individual defendants in bringing Sharika's career to a halt, constituting constructive discharge, is mental cruelty and has and will continue to cause Sharika to suffer substantial emotional distress and mental and physical suffering.

141. On many days the conduct of Robinson Bradshaw and the individual defendants caused Sharika to suffer a loss of dignity and feel worthless as a lawyer and human being.

142. On many days Sharika was reduced to tears by the conduct of Robinson Bradshaw and the individual defendants.

143. On many days Sharika became physically ill due to the stress she suffered at the hands of Robinson Bradshaw and the individual defendants.

144. In February 2019, Sharika was advised by her therapist to take a leave of absence from Robinson Bradshaw due to the emotional distress and related suffering caused by these Defendants.

### The Firm's continued false marketing

145. Despite its candid acknowledgements in its July 9, 2018 memorandum and other information and opinions the Firm has received from one or more diversity

consultants, and despite Sharika's pending EEOC charge, the Firm continues to falsely market it is "diverse" and "inclusive."

146.    As of this Complaint, the Firm has one Black associate, a male, besides Sharika.  The Firm displays him on its web page as an example of the Firm's "Happy Associates."   On information and belief that representation is false.

147.    The Firm on its web page continues to represent that "Robinson Bradshaw is dedicated to promoting an inclusive work environment in which people with different backgrounds share a commitment to our core ideals of professionalism, excellence and teamwork."

148.    The Firm on its web page continues to represent it was "an original signatory to the Mecklenburg County Bar's 2002 Call to Action to increase bar diversity."[8]

149.    The Firm continues to underperform in hiring women and minorities.

150.    The Firm continues to treat women and minorities as second-class citizens.

<u>**42 U.S.C. §1981**</u>

**(Invoked in Counts I, II and III)**

151.    Section 1981 of the Civil Rights Act of 1870, 42 U.S.C. §1981, as amended ("Section 1981"), provides:

a)      <u>**Statement of equal rights:**</u>

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and

---

[8] https://www.robinsonbradshaw.com/firm-diversity.html (January 21, 2019)

equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**b)** **"Make and enforce contracts" defined:**

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**c)** **Protection against impairment:**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

152. Sharika is a person within the jurisdiction of the United States.

153. Sharika's employment by Robinson Bradshaw is a "contractual relationship" under Section 1981(b).

154. Under Section 1981(b), Sharika, a Black female licensed attorney, has the same rights as white citizens to make and enforce her employment contract with Robinson Bradshaw, including the making, performance, modification, and termination of her contract, and the enjoyment of all benefits, privileges, terms, and conditions of her employment relationship with Robinson Bradshaw.

**Count I**
**Against All Defendants**
**Disparate Treatment in Violation of 42 U.S.C. §1981**

155. Plaintiff Sharika M. Robinson re-alleges paragraphs 1-154 as though set forth herein.

156. In violation of Section 1981(b), Robinson Bradshaw engaged in disparate treatment denying Sharika her enjoyment of the benefits, privileges, terms, and conditions of her employment relationship as an associate attorney in this law firm.

157. Without limitation, as acts or omissions constituting disparate treatment, Robinson Bradshaw denied Sharika:

   a. Her right to be treated as an equal in a diverse relationship.

   b. Her right to equality in attending Firm events such as Christmas parties. "Separate but equal" Firm-sponsored holiday parties subject to Firm-enforced restrictions on speech blatantly violate the civil rights of all Black lawyers, sending the unmistakable message their White colleagues not only view them as inferior, but that their White colleagues claim the right to control their thoughts and conversations.

   c. Her right to be treated with respect and dignity.

   d. Her right to be introduced and presented to clients as a respected equal commensurate with her status and experience as an associate in the Litigation Practice.

   e. An opportunity to develop her legal skills and experience through meaningful work assignments and opportunities.

   f. An opportunity to develop relationships with existing and prospective clients.

   g. Honest, timely, and constructive feedback on performance.

38

h. Equality in recognizing successful performance.

i. Equality in the imposition or extension of performance improvement plans.

j. Equality in setting expectations related to pregnancy and parenting responsibilities after maternity leave.

k. Equality in allowing flexible hours and working remotely.

l. Equality in not being subject to hostile work environment.

m. Equality in not being subject to unlawful retaliation.

158. In violation of Section 1981(b), Skidmore directly discriminated against Sharika when he provided more meaningful assignments to white associates, delegated Sharika as an "associate-to-an-associate," and refused to provide her equal employment opportunities and the ability to be equally engaged on matters.

159. In violation of Section 1981(b), Robertson directly discriminated against Sharika when he created or tolerated a culture that allowed for Sharika to suffer disparate treatment and be mistreated without ramification; when he attempted to force her to accept lower pay based on her request for flex time; and in providing white males and white women more privileges and flex time than Sharika.

160. In violation of Section 1981(b), Krisko and Harrington directly discriminated against Sharika when they put Sharika on a performance improvement plan (the PIP) not linked to her performance, and in providing more favorable litigation assignments and related opportunities for professional growth and development to white employees.

39

161. As alleged throughout this Complaint, the Firm and the individual defendants knowingly and intentionally discriminated against Sharika based on race.

162. The conduct of the Firm and the individual defendants was intentional or in reckless disregard to Sharika's rights under Section 1981.

163. The conduct of the Firm and the individual defendants was part of a pattern and practice of discriminatory treatment within the Firm as documented, in part, in the Firm's memorandum on July 9, 2018.

164. As the direct and proximate result of the Defendants' violations of Section 1981(b), Sharika has suffered substantial damages including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

165. As the direct and proximate result of the Defendants' violations of Section 1981(b), Sharika has also suffered substantial non-economic damages including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

166. The discriminatory conduct of the Defendants continued despite Sharika's protestations.

167. The Firm's discriminatory conduct was intentional and malicious, making it necessary to award punitive or exemplary damages to punish the Firm and deter other law firms from like misconduct.

168. The discriminatory conduct of each individual defendant was intentional and malicious, making it necessary to award punitive or exemplary

40

damages to punish these lawyers and deter other lawyers in similar positions of authority from like misconduct.

## Prayer for Relief

WHEREFORE, on Count I under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Sharika M. Robinson requests the entry of judgment against the Defendants:

A. Judgment for actual and consequential damages, both economic and non-economic, to be proven at trial and entered jointly and severally against each Defendant;

B. Punitive damages sufficient to punish each Defendants and deter others from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

## Count II
## Against All Defendants
## Hostile Work Environment in Violation of 42 U.S.C. §1981

169. Plaintiff Sharika M. Robinson re-alleges paragraphs 1-168 as though set forth herein.

170. In violation of Section 1981(b), Robinson Bradshaw denied Sharika her enjoyment of these benefits, privileges, terms, and conditions of her contractual relationship, among others and without limitation, by:

a. Sponsoring a Christmas party for Black lawyers only, evoking the discredited doctrine of "separate but equal" and squarely

41

contradicting the claim to be diverse and inclusive; and, adding insult to injury, commanding that the Black attorneys not discuss any questions or concerns related to race as they gathered in Firm-sponsored segregation.

b. Allowing partners and associates at the Firm to treat Sharika with a lack of respect.

c. Allowing partners at the Firm to communicate to Sharika the unmistakable message that "diversity" and "inclusion" do not mean Sharika can be herself, but she must instead check her identity as a Black woman at the door to conform to white male attitudes and culture.

d. Allowing partners and associates at the Firm to treat Sharika with open hostility.

e. Allowing partners and associates at the Firm to humiliate Sharika and diminish her in the eyes of clients.

f. Allowing partners and associates at the Firm to treat Sharika as a diversity prop.

g. Allowing partners at the Firm to subject Sharika to unfair and unequal evaluations and criticism of her work, intending to create the false impression she lacks intelligence and did not earn and does not deserve her place in the Firm.

h. Subjecting Sharika to excessive stress while pregnant.

42

i.  Subjecting her to excessive stress upon returning from maternity leave and refusing reasonable requests for flexible arrangements.

j.  Ignoring her successful performance in the May 2018 arbitration hearing.

k.  Subjecting her to a PIP, then extending the evaluation period for no just cause and without providing adequate support to meet the Firm's claimed expectations.

l.  Ignoring Sharika's pleas for equal treatment.

m. Ignoring overt and implicit bias against women and minorities that she experienced at the Firm.

n.  Isolating her, letting her know the Firm will not change and will not help her, but will instead punish her for speaking out against racism and sexism.

o.  Conduct since November 2018 amounting to constructive discharge.

171.  In violation of Section 1981(b), Skidmore directly discriminated against Sharika and created a severe, pervasive, intimidating, hostile, and abusive work environment when he failed to provide Sharika meaningful work opportunities on the case she was assigned to work on under his supervision, unfairly criticized Sharika to the Firm's law partners, spoke to Sharika in a harsh, demeaning manner, all while Sharika was pregnant. The consequent, clearly foreseeable stress inflicted on Sharika by Skidmore (and other Robinson Bradshaw lawyers) took a physical toll on

Sharika during her high-risk pregnancy. To protect her baby Sharika was induced early.

172. In violation of Section 1981(b), Robertson, as managing partner, directly discriminated against Sharika and aggravated the severe, pervasive, intimidating, hostile and abusive work environment by permitting and failing to stop the occurrence of the acts and omissions creating a hostile work environment. In addition:

    a. After Sharika returned from maternity leave in 2018, Robertson caused and exacerbated the unlawful hostile environment the Firm subjected Sharika to by asserting that she did not meet the minimum requirements of what it took to be a good associate, causing Sharika to cry for hours while listening to his criticisms; and

    b. As managing partner Robertson put his personal stamp of approval on the Firm's effort to destroy Sharika's self-confidence and destroy her legal career and ignored her desperate pleas for recognition as an equal person.

173. In violation of Section 1981(b), Krisko and Harrington directly discriminated against Sharika and created a severe, pervasive, intimidating, hostile, and abusive work environment by allowing the Firm's pervasive discrimination against Sharika to continue unabated and to allow other lawyers to intimidate and harass her without sanction; and specifically in allowing this discrimination and

hostile work environment to predominate in the litigation practice group; and subjecting Sharika to the PIP without cause and failing to support her.

174. The conduct of the Firm and the individual defendants creating a hostile environment was intentional or in reckless disregard to Sharika's rights and health.

175. As the direct and proximate result of the Defendants' violations of Section 1981(b), Sharika has suffered substantial damages including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

176. As the direct and proximate result of the Defendants' violations of Section 1981(b), Sharika has also suffered substantial non-economic damages including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

177. The conduct of the Defendants creating a hostile environment continued despite Sharika's protestations.

178. The Firm's conduct creating a hostile environment was intentional and malicious, making it necessary to award punitive or exemplary damages to punish the Firm and deter other law firms from like misconduct.

179. The conduct of each individual defendant creating a hostile environment was intentional and malicious, making it necessary to award punitive or exemplary damages to punish these lawyers and deter other lawyers in similar positions of authority from like misconduct.

## Prayer for Relief

WHEREFORE, on Count II under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Sharika M. Robinson requests the entry of judgment against the Defendants:

A. Judgment for actual and consequential damages, both economic and non-economic, to be proven at trial and entered jointly and severally against each Defendant;

B. Punitive damages sufficient to punish each Defendants and deter others from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

## Count III
## Against All Defendants
## Unlawful Retaliation in Violation of 42 U.S.C. §1981

180.    Plaintiff Sharika M. Robinson re-alleges paragraphs 1-179 as though set forth herein.

181.    Under Section 1981(b), Sharika, a Black female licensed attorney, has the same rights as white citizens to make and enforce her employment contract with Robinson Bradshaw, including the making, performance, modification, and termination of her contract, and the enjoyment of all benefits, privileges, terms, and conditions of her employment relationship with Robinson Bradshaw.

46

182.   In violation of Section 1981(b), Robinson Bradshaw retaliated against Sharika for speaking out on issues of race and protesting racial discrimination against her within the Firm.

183.   In violation of Section 1981(b), Robinson Bradshaw retaliated against Sharika under the doctrine of *respondeat superior* regarding the acts and omissions of Skidmore, Robertson, Krisko and Harrington as alleged in paragraphs 184, 185, and 186 *infra*.

184.   In violation of Section 1981(b), Skidmore retaliated against Sharika when she complained that he discriminated against her because of her race and gender, by singling Sharika out and providing unwarranted and prejudicial criticisms, informing her she was not part of the team, and delegating her services to other associates, in which he aimed to and successfully constructively removed/forced Sharika off of a matter.

185.   In violation of Section 1981(b), Robertson retaliated against Sharika when she requested a flexible working schedule equal to that of white attorneys, when he required that she provide him with specific details regarding who would care for her children in the evenings, while she cooked dinner, and on weekends. Robertson further retaliated against Sharika after she did not agree to reduced-work/reduced-pay as he had demanded, when he authorized the decision to place Sharika on a PIP.  Robertson also retaliated against Sharika after she complained about Schilli's racist comments, by approving the decision not to provide Sharika work and extending her evaluation under the PIP without cause and without

47

providing her with a specific improvement plan the Firm expected her to meet. The entire PIP after Sharika returned from maternity leave was retaliatory.

186. In violation of Section 1981(b), Krisko and Harrington retaliated against Sharika after she asked for a flexible working schedule by placing her on a performance improvement plan. Krisko and Harrington further retaliated against Sharika after she filed her EEOC claim by ignoring her and removing her from the work distribution rolodex. Krisko, for example, imposed criteria on Sharika that he, himself – a white man – did not achieve. On numerous occasions, Krisko was nonresponsive to client email for days, but informed Sharika that if she did not respond to even an internal email within a few hours, she was not fit to be an associate at Robinson Bradshaw.

187. The conduct of the Firm and the individual defendants was intentional or in reckless disregard to Sharika's rights.

188. As the direct and proximate result of the Defendants' violations of Section 1981(b), Sharika has suffered substantial damages including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

189. As the direct and proximate result of the Defendants' violations of Section 1981(b), Sharika has also suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

48

190. The unlawful retaliation by Defendants continued despite Sharika's protestations.

191. The Firm's unlawful retaliation was intentional and malicious, making it necessary to award punitive or exemplary damages to punish the Firm and deter other law firms from like misconduct.

192. The conduct of the individual Defendants constituting unlawful retaliation was intentional and malicious, making it necessary to award punitive or exemplary damages to punish these lawyers and deter other lawyers in similar positions of authority from like misconduct.

## **Prayer for Relief**

WHEREFORE, on Count III under 42 U.S.C. §1981 and 42 U.S.C. §1988, Plaintiff Sharika M. Robinson requests the entry of judgment against Robinson Bradshaw, Robertson, Krisko, Harrington, and Skidmore:

A. Judgment for actual and consequential damages, both economic and non-economic, to be proven at trial and entered jointly and severally against each Defendant named in this Count;

B. Punitive damages sufficient to punish each Defendants named in this Count and deter others from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

49

## Count IV
## Against Defendant Robinson Bradshaw
## Statutory Fraud in Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1, *et seq.*

193.    Plaintiff Sharika M. Robinson re-alleges paragraphs 1-192 as though set forth herein.

194.    Robinson Bradshaw has known since 2002 or earlier that diversity and inclusion have become necessary elements of a modern law firm seeking to attract top law students and seeking to attract business from clients that increasingly demand diversity from their retained law firms and other suppliers.

195.    Knowing the monetary importance of having or being seen to have a successful program on diversity and inclusion, Robinson Bradshaw has schemed since at least 2002 to convince the world that it is diverse and inclusive.

196.    To this end, Robinson Bradshaw makes representations on its web page, in marketing brochures, and in other ways intended to convince outsiders that is not merely committed to diversity and inclusion as a goal, but as a reality the Firm has supposedly achieved and lives by.

197.    The Firm's marketing of its claimed diversity and inclusion programs is aimed at future lawyers that might wish to practice with the Firm.  It is aimed at prospective clients in the business community that demand diversity in their outside law firms.  It is aimed at the legal profession as the Firm understands that being diverse and inclusive is a prerequisite to its reputation among other lawyers and Judges.  And it is aimed at the public generally.

50

198.   Section 75-1.1 of the North Carolina Unfair and Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

199.   Commerce "includes all business activities," and both false advertising and the retention of employees under false pretenses are business activities.

200.   On its web page, in printed marketing materials, and by other means. Robinson Bradshaw has made multiple and continuous deceptive acts or practices in or affecting trade or commerce in violation of N.C. Gen. Stat. § 75-1.1 *et. seq.*

201.   Robinson Bradshaw's past and continuing claims to be a diverse and inclusive law firm, and its representation it was an original signatory to the 2002 MCCA violate N.C.G.S. § 75-1.1 (a).  These representations and omissions were and remain deceptive and unfair to Sharika and other prospective employees,  prospective clients, the legal profession and the public generally because:

      a.   The Firm is not "diverse" as that term is used in the context of race and gender.

      b.   The Firm is not "inclusive" as that term is used in the context of race and gender.

      c.   The Firm has failed since 2002 to effectively "recruit, hire, train and retain minority law students and/or attorneys" as promised on the MCCA web page.

51

d.  The Firm has failed since 2002 to "establish effective mentoring and leadership training programs" as promised on the MCCA web page.

e.  The Firm has failed since 2002 to "promote, foster, and enhance diversity efforts among managing structures" as promised on the MCCA web page.

f.  The Firm has failed since 2002 to "encourage participation in sensitivity and diversity training" as promised on the MCCA web page.[9]

g.  The Firm purposefully creates the impression that, since it was a leader in answering the "call for action" on diversity and inclusion in 2002, and has had so many years to implement its actions, that by now the Firm must be successful in these efforts. In reality, the Firm did not take the "actions" called for by the 2002 MCCA "Call to Action," or its feeble efforts were not effective.

h.  The Firm purposefully creates the impression it has an active and effective Diversity & Inclusion Committee dedicated to "diversity" and "inclusion" when the Firm's diversity committee rarely meets and has accomplished little or nothing.

202.  The Firm's past and continuing deception on the subjects of diversity and inclusion is intentional or at a minimum it has been in reckless disregard of the truth.

---

[9] https://www.meckbar.org/index.cfm?pg=diversity-inclusion

203. The Firm intentionally promotes its false, undeserved, and misleading reputation on diversity and inclusion to attract unwitting women and persons of color into the Firm, as the Firm needs these persons to play their assigned role as "diversity props" to achieve its goal of deceiving the legal profession and actual and prospective clients among other intended targets of the Firm's deception.

204. As to Sharika specifically, the Firm committed further violations of N.C. Gen. Stat. § 75-1.1 *et. seq.* in her interviews with the Firm in or about January 2015, when the Firm's attorneys:

a. Misrepresented to Sharika that Robinson Bradshaw is the most collaborative and collegial law firm in the United States and a place where Sharika could thrive.

b. Misrepresented that the Firm was structured to eliminate favoritism in assigning work to lawyers, which could frustrate diversity and inclusion.

c. Misrepresented that legal work within the Firm was distributed systematically, not depending on favoritism.

d. Misrepresented that each new lawyer would have equal opportunity to work for clients and cases or matters deemed most important.

e. Misrepresented that the Firm strives to provide all associates with meaningful work opportunities enabling them to develop skills and experience early in their careers.

53

f.   Misrepresented to Sharika that the Firm would take advantage of her valuable experience clerking for two federal judges by giving her substantial responsibility commensurate with her experience.

g.   Misrepresented to Sharika that the Firm recognizes the importance of *pro bono* legal work and that Sharika could do *pro bono* work she found meaningful.

h.   Misrepresented to Sharika that the Firm wanted her to continue her mentorship of aspiring lawyers and diversity initiatives.

i.   Misrepresented that the Firm focused on outcomes, achieving results for clients efficiently, and that the Firm had eliminated billable hour requirements.

j.   Misrepresented that the Firm encouraged work-life balance allowing lawyers to pursue community and board involvement and/or meet childcare commitments and spend time with their families.

205.   The Firm has continued in making these misrepresentations and has continuously omitted to disclose facts to correct the misimpressions it created.

206.   Robinson Bradshaw's deceptive acts and omissions fraudulently induced Sharika into an employment relationship in which she was vulnerable to the disparate treatment, hostile environment, and retaliation that she has experienced.

207.   Sharika relied on the Firm's misrepresentations and omissions to her detriment when she accepted Robinson Bradshaw's offer of employment to the exclusion of other opportunities.

54

208. In inducing Sharika to rely on its continuing acts and omissions in violation of N.C. Gen. Stat. § 75-1.1 *et. seq.*, Robinson Bradshaw intentionally rendered Sharika vulnerable to both economic and non-economic injuries that were foreseeable or at a minimum it did so in reckless disregard of the truth.

209. After Sharika started her employment at the Firm, Robinson Bradshaw continued its deceptive acts and omissions and continued to induce Sharika into employment, causing Sharika to ignore constant calls and emails from regional and national recruiters seeking to place her in firms ranked higher.

210. Robinson Bradshaw's unlawful deceptive and unfair conduct extends to other victims including the Firm's clients. On information and belief:

a. Many Firm clients relied on and were deceived by the Firm's false, deceptive, misleading, and unfair claims to be a diverse and inclusive law firm.

b. Many Firm clients would have withheld some or all of the legal business they gave to Robinson Bradshaw had they known the truth about the Firm.

c. The Firm has profited from its unlawful public deception. It has cultivated clients and obtained substantial fee income by falsely posing as a leader on diversity and inclusion.

211. Discovery from the Firm and its clients will be needed to determine the extent the Firm's deceptive conduct violating N.C. Gen. Stat. § 75-1.1 *et. seq.* has enlarged the Firm's revenues and profits.

212. The Firm's deceptive and unfair conduct also amounts to fraud against the legal profession and the public generally as the Firm's partners have purposefully sought advantage in being recognized for their claimed commitment to diversity and inclusion.

213. Justice and equity demand the Firm be required to account for and disgorge all revenues gained as the result of unlawfully deceiving the public in violation of North Carolina law.

214. The Firm continues its deception in violation of North Carolina law.

215. Justice and equity demand the Firm be enjoined from its continuing deception of the public in violation of North Carolina law.

216. Unless enjoined, the Firm will continue its practice of misleading the public to believe, contrary to fact, that the Firm is committed to the ideals of diversity and inclusion.

217. The Firm's conduct violating N.C. Gen. Stat. § 75-1.1 *et. seq.* has been intentional and malicious warranting punitive or exemplary damages as provided by law.

## **Prayer for Relief**

WHEREFORE, on Count IV under N.C. Gen. Stat. § 75-1.1, Plaintiff Sharika M. Robinson requests judgment against Robinson Bradshaw for:

A. Judgment for actual and consequential damages, both economic and non-economic;

B. Punitive and treble damages sufficient to punish Defendant and deter

others from like misconduct;

C. An order requiring the Defendant to account for and disgorge all revenue obtained through a continuing course of conduct violating North Carolina law;

D. An injunction against Defendant's continuing misrepresentations and omissions claiming commitment to the ideals of diversity and inclusion;

E. Costs of suit;

F. Attorneys' fees; and

G. Such other relief available under law and deemed just and proper.

**Count V**
**Against Defendant Robinson Bradshaw**
**Fraud in Violation of North Carolina Common Law**

218.    Plaintiff Sharika M. Robinson re-alleges paragraphs 1-217 as though set forth herein.

219.    When Robinson Bradshaw lured Sharika into its employment, it knew that the Firm was neither diverse or inclusive.

220.    Robinson Bradshaw misstated facts, and concealed material facts, because it sought to hire Sharika to be the face of diversity, a diversity prop, to market her to clients and the community to support its claim to diversity.

221.    Sharika was deceived by Robinson Bradshaw's efforts and reasonably accepted its employment to her own detriment and continued to be employed at the Firm.

222. Sharika reasonably and justifiably relied on Robinson Bradshaw's misstatements and concealments of material facts.

223. The Firm's fraudulent conduct has proximately caused Sharika to suffer actual and consequential damages, and Sharika also may recover punitive damages in an amount to be determined at trial under N.C. Gen. Stat. § 1D-15.

## Prayer for Relief

WHEREFORE, on Count V under North Carolina common law fraud, Plaintiff Sharika M. Robinson requests judgment against Robinson Bradshaw for:

A. Judgment for actual and consequential damages, both economic and non-economic;

B. Punitive damages sufficient to punish Defendant and deter others from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

## Count VI
## Against Defendant Robinson Bradshaw
## Breach of Contract

224. Plaintiff Sharika M. Robinson re-alleges paragraphs 1-223 as though set forth herein.

225. Sharika's employment relationship is a contractual relationship.

226. As a matter of law, a covenant of good faith and fair dealing is implied in the parties' contractual relationship.

58

227.    As a matter of law, Robinson Bradshaw had to act in good faith and fair dealing in exercising all of its discretion as the employer in this contractual relationship.

228.    Robinson Bradshaw in bad faith entered a relationship with Sharika promising a diverse and inclusive environment, but it knew at the time of contracting it would not treat Blacks and women as equal to White men.

229.    By engaging in conduct that was discriminatory, retaliatory, and constituted a hostile environment, Robinson Bradshaw has breached its implied covenant of good faith and fair dealing.

230.    In bad faith and unfair dealing, Robinson Bradshaw deprived Sharika of the benefits of her contract by placing her on the Diversity & Inclusion Committee that does no meaningful work.

231.    In bad faith and unfair dealing, Robinson Bradshaw schemed to force Sharika out of the Firm and deprive her of the benefit of her contract in retaliation for her refusal to accept the Firm's discriminatory conduct and hostile environment.

232.    Robinson Bradshaw's conduct was in material breach of its contractual commitments to Sharika.

233.    When Robinson Bradshaw hired Sharika, it was foreseeable by the Firm that its bad faith and unfair dealing in exercising its discretion would cause Sharika to suffer economic losses including a loss of future earnings.

234. When Robinson Bradshaw hired Sharika, it was foreseeable by the Firm that its bad faith and unfair dealing in exercising its discretion would cause Sharika to suffer substantial emotional distress and mental and physical suffering.

235. The Firm's conduct has directly and proximately caused Sharika to suffer actual and consequential damages, both economic and non-economic.

## Prayer for Relief

WHEREFORE, on Count VI under North Carolina law for breach of contract including the implied covenant of good faith and fair dealing, Plaintiff Sharika M. Robinson requests judgment against Robinson Bradshaw for:

A.  Judgment for actual and consequential damages, both economic and non-economic;

B.  Costs of suit; and

C.  Such other relief available under law and deemed just and proper.

### Count VII
### Individual Defendants
### Tortious Interference with Employment and Related Opportunities

236. Plaintiff Sharika M. Robinson re-alleges paragraphs 1-235 as though set forth herein.

237. Sharika's employment with Robinson Bradshaw was a contractual relationship under North Carolina common law.

238. Defendants Robertson, Krisko, Harrington, and Skidmore were not parties to Sharika's contractual relationship with the Firm, but they knew of the contractual relationship.

60

239. These Defendants also knew that Sharika enjoyed justified expectations in her employment relationship to Robinson Bradshaw, including opportunities to progress through future partnership, develop substantial client relationships, develop a strong reputation in the legal community, and enjoy substantially enhanced income.

240. Robertson, Krisko, Harrington, and Skidmore interfered with Sharika's employment and related opportunities by discriminating against her, creating a hostile environment, retaliating against her, and spreading untruths about her performance for reasons unrelated to any legitimate business interest and for their personal enjoyment, gain, insecurities, and biases.

241. Robertson's, Krisko's, Harrington's and Skidmore's interference with Sharika's employment and related opportunities was based on actual and legal malice towards Sharika.

242. Robertson's, Krisko's, Harrington's and Skidmore's interference with Sharika's employment and related opportunities was unjustifiable.

243. Robertson's, Krisko's, Harrington's and Skidmore's conduct directly and proximately caused Sharika to suffer actual damages both economic and non-economic.

244. Sharika also may recover punitive damages in an amount to be determined at trial, under N.C. Gen. Stat. § 1D-15.

61

**<u>Prayer for Relief</u>**

WHEREFORE, on Count VII under North Carolina common law for tortious interference with employment, Plaintiff Sharika M. Robinson requests judgment against Robertson, Krisko, Harrington, and Skidmore for:

A. Judgment for actual and consequential damages, both economic and non-economic;

B. Punitive damages sufficient to punish Defendant and deter others from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

**Count VIII**
**All Defendants**
**<u>Punitive Damages</u>**

245.    Plaintiff Sharika M. Robinson re-alleges paragraphs 1-244 as though set forth herein.

246.    Each Defendant committed or participated in outrageous, willful, wanton, malicious, and wrongful conduct they knew or should have known was reasonably likely to result in injury, damage, or other harm to Sharika, and was in flagrant and reckless disregard of Sharika's rights.

247.    Because of each Defendant's willful, wanton, outrageous, and egregiously wrongful conduct, Sharika may recover punitive damages (in addition to actual and consequential damages) against each Defendant, in an amount to be

62

determined by the trier of fact, under the United States Constitution, the North Carolina Constitution, the North Carolina General Statutes, and common law.

## Prayer for Relief

WHEREFORE, on Count VIII for punitive damages, Plaintiff Sharika M. Robinson requests judgment against Robinson Bradshaw, Robertson, Krisko, Harrington, and Skidmore for:

A. Punitive damages sufficient to punish each Defendant and deter others from like misconduct;

B. Costs of suit; and,

C. Such other relief available under law and deemed just and proper.

## JURY TRIAL DEMANDED

248.    Plaintiff Sharika M. Robinson demands trial by jury in open court.

Respectfully submitted this the 1st day of March, 2019.

PLAINTIFF,

SHARIKA M. ROBINSON

By her Attorneys:

/s/ Carmen D. Caruso

Carmen D. Caruso (Illinois Bar # 6189462)
cdc@cdcaruso.com
CARMEN D. CARUSO LAW FIRM
77 West Washington Street, Suite 1900
Chicago, Illinois  60602
(312) 626-1160
*Attorney for Sharika M. Robinson*
*seeking admission pro hac vice*

63

/s/ Linda C. Chatman

Linda C. Chatman  (Illinois Bar #6201236)
lindachatman@chatmanlaw.com
CHATMAN LAW OFFICES, LLC
Two Prudential Plaza
180 N. Stetson Avenue, Suite 3500
Chicago, Illinois  60601
*Attorney for Sharika M. Robinson*
*seeking admission pro hac vice*


And

/s/ T. Greg Doucette

T. Greg Doucette (North Carolina Bar #44351)
greg@tgdlaw.com
THE LAW OFFICES OF T. GREG DOUCETTE, PLLC
311 E. Main Street
Durham, North Carolina  27701-3717
(919) 998-6993
(866) 794-7517 (fax)
*Attorney for Sharika M. Robinson*
*admitted in this District*